IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRENDA JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 12-1230 |
| | ) | |
| v. | ) | |
| | ) | Judge Terrence F. McVerry |
| R. R. DONNELLY PRINTING CO., | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | ECF No. 80 |
| Defendant. | ) | |

# MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Court grant R. R. Donnelly Printing Co.'s Motion for Summary Judgment (ECF No. 80).

## II. REPORT

### A. BACKGROUND

**1. Introduction**

Pending before the court is the Motion for Summary Judgment (ECF No. 80) filed by R. R. Donnelly Printing Co. ("Defendant") pursuant to Federal Rule of Civil Procedure 56. Defendant seeks judgment as a matter of law with respect to Brenda Johnson's ("Plaintiff") Third Amended Complaint of November 8, 2013 (ECF No. 53), alleging discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). This court exercises subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

**2. Procedural and Factual Background**

Defendant provides various businesses with integrated communications services such as printing. (ECF Nos. 82 at 1; 92 at 2). Defendant runs a plant with printing operations in Pittsburgh, Pennsylvania. (ECF Nos. 82 at 1 – 2; 92 at 2). The plant is designated as an "ISO 9001 manufacturer," and maintains a quality control system in accordance with a set of standard operating procedures enacted to ensure customer satisfaction. (ECF Nos. 82 at 1 – 2; 92 at 2 – 3). Plaintiff's position in this operation was as a "Quality Assurance Sampler." (ECF Nos. 82 at 1; 92 at 2). Standard operating procedure for a Quality Assurance Sampler involves inspecting printed materials prepared by a "cutter operator" for compliance with customer expectations, presenting said materials to a Customer Service Representative for approval, and preparing approved materials for delivery to Defendant's Shipping Department. (ECF Nos. 82 at 2; 92 at 3). Plaintiff started working for Defendant in 2005 on a temporary basis, but was eventually hired by Defendant for a permanent position as a Quality Assurance Sampler in 2007. (ECF Nos. 82 at 1; 92 at 2).

In 2011, Defendant was retained by Abercrombie & Fitch for its printing services. (ECF Nos. 82 sat 2 – 3; 92 at 3 – 4). As a part of its initial order, Abercrombie & Fitch requested 100,000 clothing tags for its "Gilly Hicks" line. (ECF Nos. 82 at 3; 92 at 3). Before the full order was to be filled, Abercrombie & Fitch required the preparation of sample tags for review and approval. (ECF Nos. 82 at 3; 92 at 3). Between January 19 and 31, 2011, Defendant printed the sample tags for shipment, classifying the job at #117199. (ECF Nos. 82 at 3; 92 at 3).

On January 31, 2011, Cyndi Massarelli, Customer Service Representative for the Abercrombie & Fitch account, received a complaint regarding the samples received. (ECF Nos. 82 at 3; 92 at 3). Andrew Shissler, Quality Assurance Coordinator, launched an investigation as

a result. (ECF Nos. 82 at 4; 92 at 3). Mr. Shissler determined that the Gilly Hicks samples contained tags that were cut off-center. (ECF Nos. 82 at 4; 92 at 3 – 4). Richard Hayden was the Cutter Operator for the Gilly Hicks samples. (ECF Nos. 82 at 4; 92 at 3). Mr. Hayden had noted that 250 sheets had been cut before he recognized the problem. (ECF Nos. 82 at 4; 92 at 3 – 4). He replaced the cutter blade, and then cut new samples that were properly centered. (ECF Nos. 82 at 4; 92 at 4).

Mr. Shissler believed that Plaintiff had been the Quality Assurance Sampler on duty at the time, based upon the Shop Floor Entry Report. (ECF Nos. 82 at 4; 92 at 4). Mr. Shissler concluded that Plaintiff must have mixed the off-center samples with approved samples prior to shipping, and informed Jim Ford, Vice President of Manufacturing. (ECF Nos. 82 at 5; 92 at 4 – 5). Mr. Ford then interviewed Plaintiff and her supervisor, Amy Bereksazi. (ECF Nos. 82 at 6; 92 at 5). There is debate as to the content of the conversation held between the parties; however, Mr. Ford ultimately concluded that Plaintiff willfully failed to follow standard operating procedure. (ECF Nos. 82 at 7; 92 at 5).

Defendant's policy in such instances is to issue a final written warning. (ECF Nos. 82 at 7; 92 at 5). Since 2011, seven other employees were considered to have violated standard operating procedures. (ECF Nos. 82 at 7; 92 at 5 – 6). All seven were issued final warnings, and all were required to provide a written statement to Defendant of their commitment to follow standard operating procedures from that point forward. (ECF Nos. 82 at 7; 92 at 5 – 6). Of these seven employees, five were Caucasian, and two were African-American. (ECF Nos. 82 at 7; 92 at 6). To date, both African-American employees subject to the final written warning continue to work for Defendant. (ECF Nos. 82 at 8; 92 at 6).

Mr. Ford drafted a final written warning for Defendant, and requested that Ms. Bereksazi present it to her. (ECF Nos. 82 at 8; 92 at 6). On February 18, 2011, Ms. Bereksazi presented the final written warning to Plaintiff, asking her to sign the document as well as provide a written statement indicating that Plaintiff will follow standard operating procedure from that date forward. (ECF Nos. 82 at 9; 92 at 6). Plaintiff refused to sign the document. (ECF Nos. 82 at 9; 92 at 6). Ms. Bereksazi followed up with Plaintiff on February 24 and March 2, 2011, but Plaintiff still declined to cooperate. (ECF Nos. 82 at 9; 92 at 6).

On March 2, 2011, Mr. Ford and Carrie Zdobinski, Human Resources Manager, met with Plaintiff. (ECF Nos. 82 at 9; 92 at 6). Plaintiff explained that she was reluctant to sign the final written warning or write a personal statement, because she believed it would be grounds for her termination if she made another mistake. (ECF Nos. 82 at 9 – 10; 92 at 6). Mr. Ford and Ms. Zdobinski asserted that Plaintiff would not be automatically fired for small errors, but only for further failure to follow standard operating procedure at some point over the next six months. (ECF Nos. 82 at 10; 92 at 6 – 7). At that point, Plaintiff claimed that she was not responsible for the sample error. (ECF Nos. 82 at 10; 92 at 7).

By March 24, 2011, Plaintiff still had not signed a final written warning, and had not provided a written statement. (ECF Nos. 82 at 12; 92 at 8). She informed Ms. Zdobinski that she would not sign, because she did not agree with her employer's conclusions. (ECF Nos. 82 at 12; 92 at 8). By April 1, 2011, Plaintiff still had not complied. (ECF Nos. 82 at 13; 92 at 8). That same day, Ms. Bereksazi and Debbie Steinmetz, a "lead" in the Handwork Department, met with Plaintiff. (ECF Nos. 82 at 13; 92 at 8). Plaintiff informed Ms. Bereksazi that she still had not signed the final written warning, or written a statement agreeing to comply with standard operating procedures in the future. (ECF Nos. 82 at 14; 92 at 8).

The remaining details of what transpired during the April 1, 2011 conversation are disputed, but following the conversation, Plaintiff collect all personal items from her workspace and locker, printed a few emails from her computer, and then left the plant. (ECF Nos. 82 at 14; 92 at 9). On her timesheet for April 1, 2011, Plaintiff wrote: "Per Amy B I was told to leave because I haven't turned in my corrective action papers." (ECF Nos. 82 at 14; 92 at 9). Plaintiff never returned to work. (ECF Nos. 82 at 14; 92 at 9). Defendant officially noted that Plaintiff was terminated on April 11, 2011, due to "failure to report to work/job abandonment." (ECF Nos. 82 at 14; 92 at 9).

Plaintiff thereafter filed charges of race-based discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 26, 2011 ([ECF No. 2-1 at 62](#)), and with the Pennsylvania Human Relations Commission ("PHRC") on September 12, 2011 ([ECF No. 2-1 at 3](#)). The EEOC issued a Notice of Right to Sue on May 29, 2012 ([ECF No. 2-1 at 1](#)). Plaintiff subsequently filed a Complaint in this court on August 27, 2012. ([ECF No. 1](#)). Her Third Amended Complaint against Defendant was filed November 8, 2013 ([ECF No. 52](#)), in which she claimed that Defendant terminated her employment due to her race, in violation of Title VII. Following the close of discovery, Defendant filed the present Motion for Summary Judgment on January 30, 2015. ([ECF No. 80](#)). Plaintiff filed a response to the motion for summary judgment on March 4, 2015 ([ECF No. 83](#)) but did not file any response to the concise statement of material facts. Therefore, on March 5, 2015, the court ordered her to file a response and sua sponte granted an extension to March 20, 2015. Without any motion for leave, attorney Piccirilli filed an amended brief in opposition to the summary judgment motion on June 24, 2015 ([ECF No. 87](#)). Although this response was untimely, because plaintiff had been hereto for proceeding pro se, the court allowed the amended brief and an amended response to the concise statement of

material facts to be filed. Defendants were of course permitted to reply. The matter is now fully briefed (ECF Nos. 81, 82, 83, 84, 85, 86, 87, 92, 94, 95), and ripe for disposition.

**B.   ANALYSIS**

**1. Standard of Review**

A grant of summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F. 3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Blunt v. Lower Merion School Dist.*, 767 F. 3d 247, 265 (3d Cir. 2014) (quoting *Natale v. Camden County Corr. Facility*, 318 F. 3d 575, 580 (3d Cir. 2003)). If the non-moving party fails to adequately establish the existence of an essential element of a claim for which it bears the burden of proof at trial, there is no genuine dispute of material fact. *Id.* (citing *Lauren W. v. DeFlaminis*, 480 F. 3d 259, 266 (3d Cir. 2007)). A non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine dispute of material fact. *Connection Training Serv. v. City of Philadelphia*, 358 F. App'x 315, 318 (3d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

In considering a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Blunt*, 767 F. 3d at 265 (quoting *Pennsylvania Coal Ass'n v. Babbitt*, 63 F. 3d 231, 236 (3d Cir. 1995)). Nevertheless, a well-supported motion for summary judgment will not be defeated where the non-moving party simply reasserts factual allegations contained in the pleadings. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n. 4 (3d Cir. 2011) (citing

6

*Williams v. Borough of West Chester*, 891 F. 2d 458, 460 (3d Cir. 1989)). Mere allegations will not survive summary judgment. *Blunt*, 767 F. 3d at 265 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

**2. Discussion**

In its Motion for Summary Judgment ([ECF No. 80](#)) and supplemental briefing (ECF Nos. 81, 85, 94), Defendant contends that it is entitled to judgment as a matter of law with respect to Plaintiff's Title VII claims, because an internal investigation led to the belief that Plaintiff had willingly violated standard operating procedure and that, even if the internal investigation consequently lead to the incorrect conclusion, there is no evidence that Plaintiff's race was a factor in the events that took place. However, Plaintiff disputes this characterization of Defendant's attempt to punish – and ultimately terminate – her; claiming that the evidence adduced in discovery demonstrates that Defendant's assertions were mere pretext for race-based discrimination. ([ECF No. 87 at 7](#) – 13).

As an initial matter, the Court of Appeals for the Third Circuit has recognized that the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims of race-based discrimination in violation of Title VII. *Trent v. Test America, Inc.*, 559 F. App'x 180, 182 (3d Cir. 2014) (citing *Jones v. School Dist. of Philadelphia*, 198 F. 3d 403, 410 (3d Cir. 1999)). First, a plaintiff must establish a *prima facie* case of discrimination. *Jones*, 198 F. 3d at 410. If such a showing is made, a defendant must "articulate some legitimate, nondiscriminatory reason for the employee's" termination. *Id.* Lastly, a plaintiff must be allowed an opportunity to prove by a preponderance of the evidence that the reasons proffered by the defendant were mere pretext. *Id.*

A *prima facie* case of race-based discrimination requires a plaintiff to demonstrate by a preponderance of the evidence that: "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he sought to retain; (3) the plaintiff suffered an adverse employment action, e.g. termination of his employment; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination." *Green v. Virgin Islands Water & Power Authority*, 557 F. App'x 189, 195 (3d Cir. 2014). In establishing the fourth element, a plaintiff may: "(1) introduce evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Id*. (citing *Sarullo v. U.S. Postal Service*, 352 F. 3d 789, 797 n. 7 (3d Cir. 2003)).

Viewing the evidence in the light most favorable to Plaintiff, the first three elements of a *prima face* case have arguably been established. It is Plaintiff's proof of the fourth element with which Defendant takes issue, and this court has cause to explore. In countering Defendant's argument that she has failed to establish the fourth element, Plaintiff first argues that the proper comparators for her would be Caucasian employees who followed standard operating procedure, but were not terminated. ([ECF No. 87 at 9](#)). Plaintiff fails to address whether there are African-American employees who followed standard operating procedure, but were not terminated. If there is a group of comparators for Plaintiff's situation, it would be Caucasian employees who were accused of failing to follow standard operating procedure, denied the accusation, refused to sign a final written warning, refused to write a personal statement of intent to follow standard

8

operating procedures in the future, and were not terminated. Plaintiff has presented no evidence of such comparators.

Further, as noted by Defendant, those other Caucasian and African-American employees who did sign the requested documents were likewise only *accused* of violating standard operating procedure. ([ECF No. 94 at 6](#)). Plaintiff presents no evidence to the contrary. As such, even when viewing all facts in the light most favorable to Plaintiff, there is no indication that Plaintiff was treated comparatively worse than similarly situated Caucasian counterparts.

Plaintiff next argues the existence of a causal nexus between her race and her termination based upon four pieces of circumstantial evidence. First, Plaintiff looks to Defendant's Shop Floor Entry Report ("Report") for January 27, 2011. ([ECF No. 87 at 10](#)). Plaintiff notes that the Report of Plaintiff's jobs that day did not include #117199, the Abercrombie & Fitch account. ([ECF No. 87-1](#)). According to Plaintiff, because the Report includes no notations regarding #117199, Plaintiff could not have worked on that job. Moreover, Plaintiff alleges that Defendant was aware of this, but still accused her of failing to follow standard operating procedures. However, Plaintiff's own testimony contradicts this assertion.

In her deposition, Plaintiff admits to shrink-wrapping and shipping samples for #117199, and made a notation on the job tag for the relevant Customer Service Representative that #117199 had been shipped. (ECF Nos. 82-2 at 26 – 29, 31; 82-3 at 2). Whatever the extent of her involvement with #117199, the fact that Plaintiff admitted to shipping the samples, while at the same time the Report made no mention of her involvement with #117199, discredits Plaintiff's assertion that if #117199 did not appear in the Report, Plaintiff could not have worked on it.

9

Plaintiff next looks to a comment made at the initial stage of a series of emails between human resources personnel regarding Plaintiff's refusal to sign the final written warning or commitment letter. (ECF No. 82-4 at 16). At the end of the first email explaining to the Employee Relations Manager the circumstances of Plaintiff's alleged error and steps that had been taken afterward in investigating and rectifying the error, there appeared the following line: "Final piece of information – Brenda Johnson is a black female." (ECF No. 82-4 at 16). Even when drawing all inferences in the light most favorable to Plaintiff, this statement does not suggest that Plaintiff was terminated because she was black any more than it suggests she was terminated because she was a female, and Plaintiff makes no such argument regarding the latter. What it does demonstrate is that Defendant's human resources personnel were concerned with thoroughly vetting all facts, and making sure that Defendant's treatment of Plaintiff was "consistent with what we have expected of all other employees in the same situation." (ECF No. 82-4 at 10). As such, the above statement does not suggest a causal nexus between Plaintiff's race and her termination.

Plaintiff also cites the use of the term "Quality Sample Picker" in the aforementioned email chain to refer to her position, even though her title is actually "Quality Assurance Sampler." (ECF No. 87 at 13). Plaintiff believes this represents a subtle reference to "cotton picker." However, the discussion of Plaintiff's position largely proceeds as follows:

> Hoechstetter has a Quality Sample Picker on every shift, whose job it is to pull sheets during runs to make sure quality standards are being met, and to pull customer sheets. Hoechstetter is an ISO certified plant, and because ISO is all about quality and conforming product, the vast majority of what the Sample Pickers do is dictated by Standard Operating Procedures.

(ECF No. 82-4 at 14). Even viewed in the light most favorable to Plaintiff, the connection between Quality Sample Picker and cotton picker is tenuous, at best. Particularly in light of the

10

fact that the statement appears to be describing, in general terms, a position held by many employees, the racial demographic of which is not defined by Plaintiff. There is no evidence presented by Plaintiff which connects Defendant's use of Quality Sample Picker to racial animus. Therefore, it does not reasonably suggest a causal nexus between Plaintiff's race and her termination.

Plaintiff then argues that Ms. Zdobinski purposely used purple font in the aforementioned email chain as a thinly veiled reference to the movie "The Color Purple." In one of her email exchanges, Ms. Zdobinski herself states: "I have no idea why the font above is purple, but it won't change, so I left it that way – sorry!" ([ECF No. 82-4 at 13](#)). Nonetheless, Plaintiff is secure in her belief that the font's use could only be a reference to the movie, and that this reference signifies Defendant's racial animus. That Ms. Zdobinski would make such an obscure reference to a movie predominantly comprised of a cast of African-American performers in an attempt to subtly undermine Plaintiff's employment due to personal racial prejudice strains credulity, even when drawing all conceivable inferences in the light most favorable to Plaintiff. Accordingly, the court cannot find that it suggests a causal nexus between Plaintiff's race and her termination.

The 'central focus' of a *prima face* case of race-based discrimination is "always whether the employer is treating 'some people less favorably than others because of their race.'" *Sarullo*, 352 F. 3d at 798 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977)). In the present case, Plaintiff's suggested comparators and circumstantial evidence fall short of establishing the fourth element of race-based discrimination by a preponderance of the evidence. Plaintiff succeeded only in producing evidence which amounts to a "collection of

11

stray remarks and unconnected, coincidental circumstances." *Greene*, 557 F. App'x at 196. Said evidence "does not a causal nexus make." *Id.* As such, no *prima facie* case has been established.

Finally, even if this court were to find that Plaintiff established a *prima facie* case, Defendant would still be entitled to judgment as a matter of law. Defendant has adduced significant evidence of a legitimate, nondiscriminatory reason for requesting that Plaintiff sign a final written warning and commitment letter, and for subsequently terminating her employment. To rebut Defendant's claims as pretext, Plaintiff must provide evidence "that would allow a fact finder reasonably to "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action." *Sarullo*, 352 F. 3d at 800 (quoting *Jones*, 198 F. 3d at 413). Plaintiff may make such a showing by demonstrating that a defendant's "proffered reasons are weak, incoherent, implausible or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.'" *Id.* (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 f. 3d 1101, 1108 – 09 (3d Cir. 1997)). He or she can also meet their burden with evidence that "the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it could not have been the employer's real reason.'" *Id.* (quoting *Jones*, 198 F. 3d at 413).

Plaintiff's claims of pretext are predicated on the exact same facts discussed above. Plaintiff's circumstantial evidence provides no connection to racial animus, and her assertion that she could not have worked on #117199 was easily refuted. Moreover, Plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" *Brewer v. Quaker State Oil Refining Corp.*, 72 F. 3d 326, 331 (3d Cir. 1995) (quoting *Fuentes v. Perskie*, 32 F. 3d 759, 765 (3d Cir. 1994)). Plaintiff has

12

failed to advance evidence from which a factfinder could reasonably disbelieve Defendant's articulated reasons, or rationally infer racial animus. As such Plaintiff cannot establish pretext.

**C.	CONCLUSION**

Based upon the foregoing, the Court respectfully recommends that Defendant's Motion for Summary Judgment ([ECF No. 80](#)) be granted. In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

                        Lisa Pupo Lenihan
                        United States Magistrate Judge

Dated: August 12, 2015